**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Abraham Farr, | No. CV-19-08127-PCT-DWL |
| Petitioner, | **ORDER** |
| v. | |
| Bonnie Jeanene Kendrick, | |
| Respondent. | |

## INTRODUCTION

Michael Abraham Farr ("Father") and Bonnie Jeanene Kendrick ("Mother") are the parents of minor children E.G.F. and E.C.F., who are twins (collectively, "the Children"). On April 29, 2019, Father filed a petition under the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.*, which implements the provisions of the Hague Convention on the Civil Aspects of International Child Abduction ("the Convention"). (Doc. 1.) The petition alleges that, in August 2018, Mother improperly removed the Children from Mexico and took them to live with her in Arizona. The petition seeks, among other things, "[a] final judgment and order in [Father's] favor directing a prompt return of the minor children . . . to their habitual residence of Mexico." (*Id.* at 14.)

Between June 12-14, 2019, the Court held an evidentiary hearing in this matter. These findings of fact and conclusions of law follow.

As the Ninth Circuit has observed, "[t]hese cases are always heart-wrenching, and there is inevitably one party who is crushed by the outcome." *Holder v. Holder*, 392 F.3d

1009, 1023 (9th Cir. 2004). That observation certainly holds true here. As explained

below, the Court concludes Father is not entitled to relief for two independent reasons: (1)

the Children's country of "habitual residence" was and is the United States, not Mexico;

and (2) returning the Children would create a "grave risk" of physical or psychological

harm.

## PROCEDURAL BACKGROUND

District courts have jurisdiction under 22 U.S.C. § 9003(a) over ICARA

proceedings. Such proceedings must be conducted on an expedited basis and should, at

least as an aspirational matter, be completed within six weeks of when the petition was

filed.[1] This compressed timeline creates an array of case-management challenges that

aren't present in a typical civil case.

In recognition of these challenges, the Ninth Circuit has stated that district courts

should "'use the most speedy procedures'" available when adjudicating ICARA claims.

*Holder,* 392 F.3d at 1023 (citation omitted). Similarly, 22 U.S.C. § 9003(d) provides that

a court presiding over an ICARA action "shall decide the case in accordance with the

Convention" and Article 2 of the Convention instructs courts to "use the most expeditious

procedures available" to implement the objects of the Convention.[2] Given this backdrop,

the Court concluded it was not required to strictly comply with the Federal Rules of Civil

Procedure or the Federal Rules of Evidence when conducting the proceedings in this case.

Instead, the Court utilized procedures that were, in its view, best suited to achieve a fair,

expeditious, and just outcome.

For example, both Father and Mother wished to—and were ultimately allowed to—

present expert testimony. The default rule under Rule 26(a)(2)(D) of the Federal Rules of

[1]     *See, e.g., Lops v. Lops*, 140 F.3d 927, 944 (11th Cir. 1998) ("Article 11 of the Hague Convention contemplates an immediate emergency hearing in international child abduction cases and a judicial decision within six weeks."); *Martinez-Castaneda v. Haley*, 2013 WL 12106712, *4 (W.D. Tex. 2013) ("The treaty contemplates that a case for the return of a child will be decided expeditiously. After a period of six weeks has passed from the time of filing of the case, the State Department may inquire of the court handling the case to provide reasons for the delay in disposing of the case.").

[2]     The Convention is available at https://assets.hcch.net/docs/e86d9f72-dc8d-46f3-b3bf-e102911c8532.pdf.

Civil Procedure is that all expert disclosures must be made "at least 90 days before the date set for trial." Additionally, Rule 26(b)(4)(A) provides that, in general, the opposing party has the right to conduct a pre-trial deposition of "any person who has been identified as an expert whose opinions may be presented at trial." It would be extremely difficult, if not impossible, to comply with these requirements in an ICARA case. Accordingly, the Court did not require Mother and Father to strictly comply with these rules.

The Court also allowed both sides to introduce expert testimony without making a threshold determination as to whether each expert's opinions met the standards for admissibility under Rules 702-704 of the Rules of Evidence. In the Court's view, this was the "most speedy" and "most expeditious" procedure in light of the Court's role as the ultimate fact-finder—dubious expert opinions could simply be disregarded or discounted. (Indeed, as discussed *infra*, the Court assigned little weight to the experts' opinions.)

The Court also acted with an eye toward expeditious resolution when applying Rule 43(a) of the Federal Rules of Civil Procedure, which provides that witness testimony ordinarily "must be taken in open court" but also provides that "[f]or good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location." Here, the Court determined that good cause and compelling circumstances were present, so it allowed both parties to present telephonic testimony from certain witnesses located outside the United States and/or outside the Court's subpoena power. The Court also arranged for a Spanish-speaking interpreter to be present, at no expense to Father (who is proceeding *pro se*), to translate the telephonic testimony of some of Father's witnesses.

Finally, during the hearing itself, the Court did not strictly apply the Federal Rules of Evidence when deciding what evidence to admit. The law requires courts in ICARA cases to apply a relaxed standard when it comes to questions of authenticity and taking judicial notice of foreign law.[3] Moreover, Rule 1101(d)(3) of the Federal Rules of

---

[3] The Convention requires courts to take notice of the laws of foreign states "without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable" (Article 14) and to automatically deem admissible any documents that were attached to the petition (Article 30). Congress

Evidence provides that the Rules of Evidence "do not apply" to "miscellaneous proceedings such as . . . extradition and rendition," and an ICARA proceeding is—in the Court's view—similar to an extradition proceeding. For these reasons, coupled with Father's status as a *pro se* litigant, the Court concluded the "most speedy" and "most expeditious" procedure would be to apply a relaxed admissibility standard during the hearing and then discount the evidentiary value of any dubious evidence during the fact-finding process. If anything, this approach benefited Father, who was allowed to introduce an array of documentary evidence and testimony whose admissibility might have been questionable under a strict application of the Rules of Evidence.

## FINDINGS OF FACT

The Court's findings of fact are set forth below. The findings are divided into four sections. First, the Court has set forth the background facts and chronology concerning Mother and Father's relationship, their move to Mexico with the Children in August 2015, and Mother's removal of the Children to the United States in August 2018. Second, the Court has made findings concerning facts that bear upon whether the Children's "habitual residence" should be considered Mexico or the United States. Third, the Court has made findings concerning facts that bear upon whether the Children would be exposed to a "grave risk" of harm if returned to Father's custody in Mexico. Fourth, in an abundance of caution, the Court has identified some of the incidents that were the subject of significant discussion during the evidentiary hearing but which the Court views as immaterial to the legal issues before it. The Court has also identified some of the witness testimony that it deemed not credible or otherwise entitled to little evidentiary weight.

…

…

---

seemingly implemented Article 30 through its enactment of 22 U.S.C. § 9005, which provides that "[w]ith respect to . . . any other documents or information included with [an ICARA] application or petition or provided after such submission which relates to the application or petition, as the case may be, no authentication of such application, petition, document, or information shall be required in order for the application, petition, document, or information to be admissible in court."

## I.    Background Facts And Chronology

1.    In 2007, Father and Mother met in Texas.  At the time, Mother had a five-year-old child (Z.A.K.) from a previous relationship.

2.    In 2009, Mother became pregnant with Father's child.  However, by the time the child (a boy named K.M.K.F.) was born in December 2009, the couple had separated, with Father living in Mexico and Mother living in the United States.[4]

3.    In 2011, Father was hospitalized in Texas due to drug-induced "psychosis," which was caused, at least in part, by Father's recurrent use of illegal hallucinogenic drugs.

4.    Following this incident, Father received assistance from his cousin, Jon Farr, who encouraged Father to stop using drugs and also encouraged Father to become more religious.  Father's increasing religious devotion resulted in tension between Father and certain members of his family—in particular, his father Lynnwood Farr, his brother Paul Farr, and his sister Stephanie Farr, all of whom came to view Father's methods for disciplining the Children (which are rooted, in part, in Father's religious beliefs) as abusive and inappropriate.

5.    At some point in 2012, Mother and Father began living together in Texas with K.M.K.F.

6.    In May 2014, Father and Mother got married in Texas.  Soon afterward, Mother learned she was pregnant with the Children.

7.    In February 2015, the Children were born in Texas.

8.    In August 2015, Mother, Father, Z.A.K., K.M.K.F, and the Children moved to Mexico so Father could pursue a job opportunity with a company owned by his sister, Stephanie Farr.

9.    In October 2016, Mother took a trip to Texas to visit family members. During this trip, Father had a second "psychosis" episode that required medical care.  This episode, like the one before it, was caused by Father's use of illicit drugs.[5]

---

[4]    From 2007 through 2015, Mother lived continuously in the United States, while Father moved several times between the United States, Canada, and Mexico.

[5]    Father presented testimony during the hearing that the second episode was caused

10. In late November or early December 2016, Mother contacted a representative from the United States Consulate to seek assistance in returning to the United States with the Children. (Exhibit 135.)

11. In January 2017, Mother and Father separated and began living in different residences in Mexico. Following the separation, Mother and Father shared joint custody of the Children.

12. In February 2017, Father filed a criminal complaint (Exhibit 35) against Mother with Mexican law enforcement authorities.

13. In April 2017, Mother was involved in an automobile accident. While she recovered, Father took care of the Children with the assistance of a nanny. After Mother recovered, she and Father resumed their shared custody schedule.

14. In July 2017, Father filed for divorce from Mother in Mexico.

15. In April 2018, Mother filed a criminal complaint (Exhibit 94) against Father with Mexican law enforcement authorities, which resulted in the entry of a protective order against Father. Among other things, Mother asserted in this complaint that "violence physical, emotional and economic [had been] exerted on me by" Father.

16. A few days later, on April 11, 2018, Father filed a criminal complaint (Exhibit 51) against Mother, accusing her of kidnapping the Children.

17. In or around May 2018, Mexican government officials removed K.M.K.F. from the custody of both Mother and Father and placed the child in protective custody. Afterward, Father, Mother, and K.M.K.F. were all ordered to participate in court-ordered psychological examinations.

18. In June 2018, the protective order was dissolved and Father was allowed to continue exercising custody of K.M.K.F.

19. On August 11, 2018, Mother (with assistance from her father-in-law, Lynnwood Farr) left Mexico with the Children and began living with the Children in Lake

by a one-time use of marijuana. The Court views this claim with some skepticism. Nevertheless, no contrary evidence was submitted by Mother.

Havasu City, Arizona. K.M.K.F remained in Mexico living with Father.

20. In September 2018, a Mexican court entered a divorce decree that dissolved Father's and Mother's marriage.

21. In October 2018, Father married a new wife, Alejandra Rodriguez, in Mexico.

II. <u>Habitual Residence</u>

    a. **Facts Tending To Demonstrate Mexico Was The Children's Habitual Residence**

22. When moving to Mexico in August 2015, Father and Mother sold most of their possessions, terminated the lease on their home in the United States, shipped their remaining possessions to Mexico, and didn't retain any possessions in storage in the United States.

    b. **Facts Tending To Demonstrate The United States Was The Children's Habitual Residence**

23. Father and Mother are both citizens of the United States and are both veterans of the United States Navy.

24. At the time of the move, Mother viewed the relocation to Mexico as temporary in nature. Mother credibly testified that she believed her family would only remain in Mexico for 3-5 years before returning to the United States.[6] This assertion was corroborated by an array of evidence. For example:

▪ Stephanie Farr testified the job offer to Father was for a "temporary" position that would only last two years.[7] After that, there was merely a possibility that Father might be

---

[6] During the evidentiary hearing, Father spent a significant amount of time attempting to impeach Mother's credibility by suggesting she made false statements in the criminal complaint she filed against Father in Mexico, when attempting to secure emergency visas to return to the United States, and when speaking with a member of the Lake Havasu Police Department after returning to the United States. In the Court's view, these impeachment attempts largely fell flat. Many of the purported inconsistencies and exaggerations that Father sought to raise can be chalked up to translation and transcription issues. Additionally, although Mother's statement to the Mexican authorities that Father had "exerted" "violence physical" toward her is difficult to reconcile with Mother's admission during the hearing that Father has never hit her, Mother credibly explained why she subjectively felt threatened.

[7] It should be noted that Stephanie Farr also characterized Father's position as being "indefinite" in duration. An "indefinite" job is different from a "temporary" job.

- 7 -

able to transition into a different position. There was no written employment contract.

▪ Mother began asking to move back to the United States almost immediately after the family arrived in Mexico. Mother testified that she made her first request to move back by late 2015 and there were multiple email exchanges and secretly-recorded audio recordings[8] introduced into evidence in which Mother repeated this request from December 2016 onward.

▪ In the Court's view, perhaps the most telling piece of evidence pertaining to the temporary nature of the move to Mexico is Exhibit 26. This is an email exchange between Mother and Father from January 2017. In this exchange, Mother described Houston, Texas as "home" and "our permanent residence" and reiterated her desire to return there.[9] In response, Father didn't dispute Mother's characterization of the United States as the couple's "home" and "permanent residence" and merely sought to postpone deciding when (or if) the move would occur.

25. Mother, Father, Z.A.K., K.M.K.F, and the Children entered Mexico in August 2015 on temporary visas. The temporary visas of Mother, Z.A.K., and the Children expired in August 2017 and were not renewed.

26. During a conversation with Bruce Kendrick at some point in 2016, Father stated he was considering moving back to the United States and re-enlisting in the Navy as

Nevertheless, in light of all of the evidence in the record, the Court concludes Father's position was a temporary one.

[8] Between 2016 and 2018, Father secretly recorded many of his conversations with Mother. These conversations were difficult to listen to, as they revealed raw, emotional disagreements between a couple whose marriage was falling apart. Nevertheless, Mother's statements during these recordings were essentially consistent with the position she has taken in related court proceedings and in this case. This consistency further bolsters the Court's conclusion that Mother was a credible witness. Conversely, Father's decision to make these secret recordings does not enhance his credibility, as it appeared he was attempting to bait Mother into making admissions. Furthermore, although Father seemed relatively calm and composed during these conversations in relation to Mother, this difference is explained by the fact that Father was the only one who knew the conversations were being recorded and thus had an obvious motive to portray himself in a positive light.

[9] Specifically, Mother's email of January 9, 2017 at 1:13 p.m. stated: "I want to reiterate that my first desire is to return home to our permanent residence in Houston, Texas where we have support through church and family and friends to get through this difficult time and where it makes most sense economically and where we have security."

- 8 -

a chaplain.

27.    All of Mother's extended family members reside in the United States, as do most of Father's extended family members.  (The only Mexican resident on either side is Father's sister Stephanie.)

28.    Between August 2015 and August 2018, Father made at least seven trips to the United States and another trip to Canada.  Three of these trips were to obtain medical services at Veterans Administration facilities in Texas.  Others were for family events such as family reunions.

29.    Although Father is fluent in Spanish, Mother and the Children are not. Additionally, the Children were not enrolled in school during their three years in Mexico.

30.    Father continued using an American bank account, and maintaining American automobile insurance, after moving to Mexico.  (Exhibit 85.)

31.    Father utilized an address in Colorado—which he described as his "permanent address" during a recent interaction with the police (Exhibit 85)—as his address of record throughout this lawsuit.

III.    <u>Grave Risk</u>

a.    **Facts Tending To Negate The Existence Of Grave Risk**

32.    Following his second "psychosis" episode in October 2016, Father began undergoing voluntary monthly drug tests.  Father's results have been consistently negative from November 2016 to the present.

33.    Father has never hit Mother or otherwise engaged in physical violence toward her.

34.    In October 2016, during a conversation with Jon Farr, Mother stated that she didn't harbor any concern about Father posing a risk of physical harm to others.

35.    In December 2016, Mother suggested (Exhibit 74) that she and Father resume living in the same home (albeit in different bedrooms)

36.    Exhibits 19 and 20 depict the Children lighting up when they see Father and hugging him.  These videos also show Father interacting with the Children in a loving and

appropriate way.

37. As noted, in June 2018, the protective order against Father was dissolved. The accompanying report (Exhibit 55) issued by Mexican authorities included findings that Father "does not present traits or characteristics of being [a] generator of domestic violence" and that "there is no risk for the child [K.M.K.F.] to live with his father." This report also concluded that Mother had "misused" the protection order in an effort to "prevent the relationship of the child [K.M.K.F.] with his father."[10]

38. Father's current wife, Alejandra Rodriguez, believes Father is a loving, non-dangerous parent who has a strong bond with the Children. She regularly leaves her two children from a prior relationship in Father's care.[11]

39. K.M.K.F., who currently lives with Father in Mexico, enjoys living with Father (K.M.K.F. testimony)[12] and has a "strong bond" with Father (Exhibit 66).

b. **Facts Tending To Demonstrate The Existence Of Grave Risk**

40. As noted, Father has been hospitalized twice in the last eight years for episodes of "psychosis" caused by the use of illicit drugs.

41. Father administers corporal punishment to the Children and to K.M.K.F. with great frequency. Mother testified that Father would, from 2015 to 2018, physically discipline the Children seven times in an average week ("daily") and physically discipline K.M.K.F. between five and fifteen times in an average week. When Father was later asked whether he agreed with Mother's estimates, he provided slightly lower (but still significant)

---

[10] One witness (Lynnwood Farr) suggested during the hearing that the results of the Mexican inquiry should be disregarded because the inquiry was tainted by fraud and corruption. No evidence, however, was introduced to support this accusation.

[11] The Court generally found Ms. Rodriguez to be a credible witness. On the one hand, her testimony was compelling because common sense suggests a mother wouldn't entrust her own children to a man she honestly believed to be violent and erratic. On the other hand, her testimony appeared to have been somewhat rehearsed, she has an obvious bias in favor of Father (as his current wife), and the Court couldn't observe her demeanor because she was testifying telephonically from Mexico.

[12] Although it is difficult to assess the demeanor of a child witness who is testifying telephonically, and although Mother's filings in this case suggest that Father has exerted undue influence over K.M.K.F., he struck the Court as a happy, good-natured boy who loves his Father.

figures, stating that he would physically discipline the Children two or three times in an average week and would physically discipline K.M.K.F. between seven and fourteen times in an average week ("once or twice every day").

42.     Father does not use his hands to administer corporal punishment because they are large and potentially dangerous.  Instead, he uses various objects.  He previously used a section of PVC pipe or a wooden dowel and currently uses an assortment of plastic rulers (depicted in Exhibit 124).

43.     Specifically, Father uses six different rulers as part of the punishment process.  Each is differently colored and corresponds with a particular sin.  Thus, the red ruler might be the ruler used to punish "disobedience," while the green ruler would be used to punish a different transgression.

44.     Father's typical practice, when administering corporal punishment, is to take the child being disciplined to a private room and require the child to pull down his or her pants so that the child's bare bottom is exposed.  There has been no suggestion this practice has any sexual overtones—it is apparently meant to ensure the child's clothes don't blunt the impact of the ruler.

45.     Each discipline session involves multiple strikes.  Father testified that he usually administers between one to six strikes, depending on the sin that precipitated the session.  Further, Father testified he never struck any of his children more than six consecutive times.  However, K.M.K.F. testified that he was once struck more than 20 times in a single session.

46.     Although Father testified that he always administers corporal punishment in a calm, safe manner intended to eliminate the risk of harm (he used the phrase "loving and appropriate"), the evidence introduced during the hearing established that Father caused injury to the Children on multiple occasions.  Exhibit 119 is a series of five photographs.  Each depicts a separate instance when Father struck one of the Children (who were as young as 20 months old) with enough force to cause bruising and/or other noticeable marks on the child's bottom or thigh.  In one audio recording, Father acknowledged leaving such

marks. Additionally, Mother credibly testified that she only began documenting these marks after she began noticing a pattern, which suggests there were more than five instances in which the Children sustained injuries.

47. Father's brother (Paul Farr), sister (Stephanie Farr), and father (Lynnwood Farr) all testified on Mother's behalf during the evidentiary hearing. These witness's preference for Mother as a parent stems largely from their discomfort with Father's corporal punishment methods.

48. In June 2018, Father went to Mother's residence in an attempt to retrieve K.M.K.F. Father was accompanied by Mexican law enforcement officials. Portions of this episode were videotaped (Exhibit 130). During the video, Father is shown speaking with K.M.K.F. (who was eight years old at the time) and telling the boy that Mother was improperly "keep[ing] you from seeing me," that "this police officer has come because what your mother is doing is not right," that "your mom is going to go around telling people that I am aggressive and trying to hurt you physically," that "your mom has been telling lies," and that "what your mom is doing is wrong and illegal."[13]

IV. Facts And Testimony To Which Little Weight Was Assigned

49. In October 2016, while Mother was in the United States, Father had a major disagreement with Z.A.K., Mother's teenage daughter from a previous relationship. The disagreement stemmed from Father's (unfounded) suspicion that Z.A.K. wasn't going to a friend's house to study and was instead going out to drink alcohol. The incident culminated with Z.A.K. spending the night barricaded in the bathroom and making emergency phone calls to Mother and to Jon Farr, Father's cousin. Father was holding a pair of scissors while speaking with Z.A.K., which caused Z.A.K. to be frightened. The following day, Z.A.K. met with a counselor at her school, Francine Britton, who observed that Z.A.K. was in obvious distress.

---

[13] Although it is understandable that Father would hold deep feelings of distrust and anger toward Mother in light of their ongoing custody dispute and dueling criminal complaints in the Mexican court system, it is inexcusable that one parent would disparage the other parent to a young child in the manner depicted in Exhibit 130.

<u>Reason For Assigning Little Weight</u>:  Although Mother placed significant emphasis on this episode during the evidentiary hearing, the Court doesn't view it as shedding much light on the issue of grave risk.  To be clear, the Court viewed Z.A.K. as a credible witness, accepts her factual account of the incident, and accepts her contention that the incident was traumatizing to her.  The Court also accepts Francine Britton's testimony concerning her observations of Z.A.K. following the incident.  Nevertheless, emotional disagreements between teenagers and step-parents are not uncommon and, although this episode does not paint Father in a particularly flattering light, it doesn't suggest he'd pose a grave risk of harm to the Children if they were returned to his custody.

50.     In April 2018, Father's dad (Lynnwood Farr) met with Father in Mexico in the presence of K.M.K.F.  During this meeting, Father attempted to explain the rationale behind his corporal punishment methods.  At one point during the discussion, Father made a statement to the effect of "God will forgive any sin, even murder" and then asked K.M.K.F. to retrieve one of Father's large knives.  After K.M.K.F. handed over the knife, Father proceeded to elaborate on the point about forgiveness while holding and gesturing with the knife.

<u>Reason For Assigning Little Weight</u>:  The Court viewed Lynnwood Farr as a credible witness, accepts his factual account of this incident, and accepts his testimony that he subjectively felt Father's display of the knife was inappropriate and menacing.  Nevertheless, the Court doesn't view this incident as proof that Father would resort to knife-related violence in the future.

51.     Over a period of several months in 2018, Father placed large, professionally-designed signs in prominent places around the town where he and Mother were separately living.  (Exhibits 53, 128.)  One sign stated: "Jeanene, stop hurting the kids.  Let them see their dad!"  Another sign stated: "[K.M.K.F. and the Children]: I love you, be brave, don't be scared.  Daddy is trying to find a way to see you."

<u>Reason For Assigning Little Weight</u>:  Although Father displayed poor judgment and a lack of emotional control by displaying these signs around town, the Court doesn't view

this episode as proof that the Children would be exposed to a grave risk of harm if left in Father's custody. The divorce and custody dispute created many strong emotions on both sides.

52. Father once had a dream/nightmare in which he may have engaged in some sort of sexual behavior with Z.A.K. He spoke about the dream afterward with others.

<u>Reason For Assigning Little Weight</u>: It appeared, from the fact Mother brought up this dream during the evidentiary hearing, that Mother views it as relevant to the issue of grave risk. The Court disagrees. Having an odd dream doesn't create a risk that a person will act out what occurred in the dream.

53. Victor Leon Ponce De Leon Torres (K.M.K.F.'s martial arts teacher in Mexico), Maria Lourdes De La Cruz Marroquin (a former nanny), Margarita Rivas Leon (K.M.K.F.'s school teacher in Mexico), and Jim Budd (an acquaintance of Father's) all believe that Father is a good parent and that K.M.K.F enjoys living with Father.

<u>Reason For Assigning Little Weight</u>: None of these witnesses testified during the evidentiary hearing. Instead, Father submitted their opinions through hearsay submissions—specifically, interview summaries written by Mexican law enforcement officials (Exhibits 36 and 43) or declarations (Exhibits 45 and 46). Thus, Mother was not afforded the opportunity to cross-examine these witnesses and explore the foundation for their opinions, including whether they were aware of the frequency and other details of Father's corporal punishment.

54. Maria Magdalena Baiza, who served as the Children's nanny during part of their time in Mexico, believes that the Children prefer living with Father and never saw Father get explosively angry with or yell at the children.

<u>Reason For Assigning Little Weight</u>: During cross-examination, Baiza testified that Father never spanked the Children. This is obviously untrue—even Father admits to administering corporal punishment to the Children several times per week. Additionally, after her testimony was complete, Baiza volunteered a lengthy statement expressing her desire for Father to prevail in this lawsuit. This expression of bias further eroded her

credibility as a witness.

55.    The Mexican government allowed Father to obtain a divorce from Mother in Mexican court and to marry a new wife, Alejandra Rodriguez, under Mexican law.

Reason For Assigning Little Weight:  Father has suggested these developments tend to show he was habitually residing in Mexico, because the Mexican government wouldn't have granted a divorce or marriage license to a non-habitual resident.  The Court disagrees.  "Habitual residence" is a term of art under the ICARA.  There is no evidence that the Mexican government has adopted the same standard as a threshold for granting divorces or issuing marriage licenses.

56.    One of Father's expert witnesses was Rodolfo Ramos Carranza, a government psychologist in Mexico who conducted a court-ordered psychological examination of Father and then issued a report (Exhibit 10) concluding, among other things, that Father "does not present features of being a person that generates violence," is "a clinically healthy person with psychological and emotional balance," and does not possess any "trait that could harm his children in their healthy development."

Reason For Assigning Little Weight:  First, and most important, Carranza admitted during cross-examination that he was unaware that the Children had suffered marks and bruises due to Father's corporal punishment, that Father removed K.M.K.F.'s clothes before administering corporal punishment, or that Father would strike K.M.K.F. multiple times during each corporal punishment session.  It is therefore difficult to give much credence to Carranza's opinions concerning the propriety of Father's discipline methods and the risk of harm they create.

Second, although Carranza administered an MMPI test to Father as part of his psychological evaluation, Father never produced the MMPI test results to Mother as part of the discovery process in this case.  These results had the potential to be particularly probative in light of Father's history of psychiatric episodes.  Mother should have been given all of the materials underlying Carranza's evaluation in order to meaningfully cross-examine him.

57. Father's other expert witness was Enedina Losoya Baeza, a Mexican attorney who has represented him in various legal proceedings in Mexico. In a nutshell, Ms. Losoya opined that (1) Father was exercising his custodial rights under Mexican law at the time of the Children's removal in August 2018 and (2) Father had a "permit to work" in Mexico and is therefore considered a lawful temporary resident under Mexican law.

Reason For Assigning Little Weight: As for Ms. Losoya's first opinion—Father was exercising his custodial rights under Mexican law at the time of the Children's removal—Mother doesn't appear to be seriously contesting this element of the ICARA claim. (Mother's counsel conceded, during Ms. Losoya's examination, that "the parties were separated and they were exercising a reciprocal parenting time arrangement prior to the date Mother left.") Thus, the Court accepts Ms. Losoya's opinion on this topic. However, the Court assigns little weight to Ms. Losoya's remaining opinions concerning the residency status of Father and others under Mexican law. Notably, Ms. Losoya conceded during cross-examination that "I'm not an expert in immigration matters." Given this concession, it is difficult to place much stock in her immigration law-related opinions.

58. Mother's sole expert witness was Francine Britton, who is an educator at Z.A.K.'s school. In a nutshell, Ms. Britton opined that Father violated several provisions of the Convention on the Rights of the Child by administering corporal punishment to K.M.K.F. and the Children (and also violated the Convention during the fight with Z.A.K. in October 2016) and that such violations demonstrate why the Children would be exposed to a grave risk of harm if returned to Father's custody.

Reason For Assigning Little Weight: First, Ms. Britton conceded the United States has never ratified the Convention on the Rights of the Child. It is therefore difficult to understand how or why it should have any relevance in an ICARA proceeding. Indeed, Article 3(A) of the Convention purports to require all "courts of law" to assign "primary consideration" to "the best of interests of the child" in "all actions involving children." The Ninth Circuit, however, has made clear that "a court considering a Hague petition should not consider matters relevant to the merits of the underlying custody dispute such as the

best interests of the child, as these considerations are reserved for the courts of the child's habitual residence. . . . [C]ourts [instead must] perform more objective inquiries, such as the determination of the child's habitual residence and whether the child was wrongfully removed or retained." *Asvesta v. Petroutsas*, 580 F.3d 1000, 1015-16 (9th Cir. 2009) (citation omitted). When faced with a choice between following a Convention that was never ratified by the United States and binding Ninth Circuit law, the Court obviously must follow the latter.

Second, Ms. Britton's opinion that a parent violates the Convention any time the parent spanks a child or otherwise administers corporal punishment is questionable. The provisions of the Convention that Ms. Britton cited during her testimony do not specifically mention corporal punishment and seem to be limited to other, qualitatively different forms of abuse such as "torture or other cruel, inhuman or degrading treatment or punishment," "capital punishment," or "life imprisonment without possibility of release" (Article 37). One does not have to approve of corporal punishment to conclude it falls outside that list of proscribed conduct.[14]

Third, Ms. Britton acknowledged during her testimony that she is a personal friend of Mother's and has helped provide support to Mother in the past. Although those actions are laudable and reflect well on Ms. Britton's character, they undermine her objectivity as an expert witness.

## CONCLUSIONS OF LAW

I.    Legal Framework

"A court that receives a petition under the Hague Convention may not resolve the questions of who, as between the parents, is best suited to have custody of the child." *Cuellar v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010). Instead, the court must begin its analysis by determining whether "the child has been wrongfully removed or retained within

---

[14]    *See generally* Benjamin Shmueli, *The Influence of the United Nations Convention on the Rights of the Child on Corporal Punishment—A Comparative Study*, 10 Or. Rev. Int'l L. 189, 203-04 (2008) ("[Some] have firmly objected to the interpretation that the Convention does restrict corporal punishment").

- 17 -

the meaning of the Convention." 22 U.S.C. § 9003(e)(1)(A).  The petitioner—in this case, Father—bears the burden of proof on this issue and must prove it "by a preponderance of the evidence."  *Id.*  If such a showing is made, the burden shifts to the party opposing the return of the child—in this case, Mother—to prove "by clear and convincing evidence that one of the exceptions set forth in article 13b or 20 of the Convention applies."  *Id.* § 9003(e)(2)(A).

When addressing the first issue (*i.e.,* whether the removal/retention was "wrongful"), the district court must answer a series of four questions:

> (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

*Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001).  Here, the first, third, and fourth questions aren't disputed.  The challenged removal took place in August 2018, the removal breached Father's custodial rights under Mexican law, and Father was actually exercising those rights at the time of the removal.  Thus, the only disputed question is the second one—what was the Children's country of "habitual residence" at the time of the removal? That question is addressed in Part II below.

As for the second issue (*i.e.,* whether any exceptions apply), Mother seeks to invoke Article 13(b) of the Convention, which provides that a court "is not bound to order the return of the child if [the respondent] establishes that . . . there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  This provision is addressed in Part III below.

II.   Habitual Residence

"The term 'habitual residence' was intentionally left undefined in the Convention." *Holder*, 392 F.3d at 1015.  This lack of definition is somewhat surprising, given that "[d]etermination of 'habitual residence' is 'perhaps the most important inquiry under the Convention.'"  *Murphy v. Sloan*, 764 F.3d 1144, 1150 (9th Cir. 2014) (citation omitted). In any event, the Ninth Circuit has filled this definitional void by creating what is

essentially a two-part test: "[T]he proper standard for habitual residence . . . takes into account the shared, settled intent of the parents and then asks whether there has been sufficient acclimatization of the child to trump this intent." *Id.* This is a "flexible, fact-specific" inquiry, and "courts must consider the unique circumstances of each case when inquiring into a child's habitual residence." *Holder*, 392 F.3d at 1015-16.

### A.    Shared, Settled Intent Of The Parents

The first step in the analysis is to assess whether Mother and Father "had a settled intention to abandon the United States as the children's habitual residence in favor of [Mexico]." *Holder*, 392 F.3d at 1016. "To resolve this question . . . we look to the subjective intent of the parents, not the children." *Id.* This intent may be expressed not only through "the representations of the parties" but also through "all available evidence." *Id.* at 1017.

Here, Mother and Father did not have a shared, settled intent to abandon the United States as their habitual residence. This question is not particularly close or difficult—the evidence points overwhelmingly toward the conclusion that the move to Mexico was temporary and provisional. As noted in the Findings of Fact, Mother believed at the time of the move in August 2015 that the relocation to Mexico was temporary and that the family would be returning to the United States in a few years. Notably, Father did not offer any contrary testimony concerning his subjective intent at the time of the move. Father also didn't dispute Mother's characterization of Texas as the couple's "permanent residence" and "home" after the couple began fighting and even referred to the United States as his "permanent address" in other proceedings.[15] Furthermore, Mother began attempting to move back to the United States within a few months of arriving in Mexico, Father himself considered moving back to the United States in 2016 so he could re-enlist in the Navy,[16]

---

[15]    *See, e.g., Holder*, 392 F.3d at 1017-19 (father's statement in another lawsuit that the United States was his "permanent residence" was strong evidence that the parents didn't intend to abandon the United States as their permanent residence when moving to Germany as part of the father's employment in the military).

[16]    *See, e.g., Ruiz v. Tenorio*, 392 F.3d 1247, 1254-55 (11th Cir. 2004) (affirming district court's conclusion that parents never had a shared intent to make Mexico their habitual residence, even though they remained there for nearly three years, in part due to

and the family members only held temporary visas (some of which expired and weren't renewed, making their continued presence in Mexico unlawful).[17] On top of all of this, Mother and Father retained deep ties to the United States during their time in Mexico—Father repeatedly traveled to the United States for medical treatment and family visits—and Father kept using American bank accounts and American automobile insurance.[18] Although it is true that Mother and Father didn't maintain any possessions in the United States and shipped most of their possessions to Mexico—a fact that, in isolation, might suggest an intent to abandon the United States as a habitual residence[19]—this fact does not tip the scales in Father's favor in light of the mountain of evidence pointing in the other direction.

The Ninth Circuit's decision in *Murphy* supports the conclusion that there was no settled intent to abandon the United States as a habitual residence under these circumstances. There, the parents were married in the United States in 2000 and had a child in the United States in 2005. 764 F.3d at 1147-48. In 2009, the parents separated for romantic purposes but remained married and continued living in the same house. *Id.* at 1148. In 2010, after the mother applied to graduate school in Ireland, the parents discussed moving to Ireland for a "trial period." *Id.* The parents and child remained in Ireland for

_____

the father's "exploration of job opportunities in the United States during his sojourn in Mexico," which showed that his "intention with respect to the permanence of the move to Mexico was ambiguous").

[17] *See, e.g.*, *Mozes*, 239 F.3d at 1082 n.45 ("[A]n unlawful or precarious immigration status . . . [is] a highly relevant circumstance where, as here, the shared intent of the parents is in dispute."); *Neergaard-Colon v. Neergaard*, 752 F.3d 526, 532 (1st Cir. 2014) (reversing the district court's conclusion that parents abandoned the United States as a habitual residence when moving to Singapore so the father could pursue a temporary job and faulting the district court for failing to consider that "the father . . . did not pursue permanent residence status for his family in Singapore").

[18] *See, e.g.*, *Ruiz*, 392 F.3d at 1254 (the mother's retention of "bank accounts and credit cards in the United States" was an "objective fact[] indicating [her] lack of intention to move permanently to Mexico"); *Maxwell v. Maxwell*, 588 F.3d 245, 253 (4th Cir. 2009) (concluding, in ICARA case, that the mother's decision to "maintain[] her local financial accounts, North Carolina Medicare insurance, and the lease and insurance on her vehicle" helped "support the conclusion that [the mother] intended that the move to Australia would be conditional").

[19] *Holder*, 392 F.3d at 1018 ("[O]ur sister circuits have found a settled intention to acquire a new habitual residence based in part on the shipment of family possessions to the new location coupled with a failure to maintain a residence in the former location.").

three years, from 2010-13, but the child returned to the United States several times each year to visit family and celebrate certain holidays. *Id.* Finally, in June 2013, the father took the child back to the United States without the mother's approval. *Id.* at 1149. In response, the mother filed an ICARA petition seeking the child's return to Ireland. *Id.* The district court denied the petition and the Ninth Circuit affirmed, concluding the parents never had a shared intent to abandon the United States as their habitual residence because, among other things, (1) the move to Ireland was for a "trial period," (2) they "retain[ed] strong ties to community and family" in the United States while living in Ireland, (3) the child retained U.S. citizenship, and (4) the mother never acquired an Irish driver's license. *Id.* at 1151. Here, similarly, although the Children ended up residing in Mexico for nearly three years, Mother always viewed the move as temporary in nature, Father and Mother retained strong ties to the United States and came back for frequent visits, the family members retained U.S. citizenship and only had temporary status in Mexico (which lapsed for some of them in 2017), and Father never stopped banking and obtaining car insurance in the United States.

### B. **Acclimatization**

Because Father and Mother lacked a shared, settled intent to abandon the United States as their habitual residence, the Court must proceed to the second step of the analysis, which is to "ask[] whether there has been sufficient acclimatization of the child to trump this intent." *Murphy*, 764 F.3d at 1150. In general, the concept of acclimatization reflects the principle that, "given enough time and positive experience, a child's life may become so firmly embedded in the new country as to make it habitually resident even though there [may] be lingering parental intentions to the contrary." *Mozes*, 239 F.3d at 1078. The Ninth Circuit has cautioned, however, that "'courts should be slow to infer [acclimatization],' both because the inquiry is fraught with difficulty, and because readily inferring abandonment would circumvent the purposes of the Convention." *Murphy*, 764 F.3d at 1152-53 (citation omitted).

Here, the question of acclimatization isn't close. The Children were less than a year

old at the time they moved to Mexico and were only three years old when they returned to the United States. They do not speak Spanish and were not enrolled in school when in Mexico. Furthermore, Father brought the Children with him on at least one occasion to visit family members who lived outside Mexico. The Ninth Circuit has emphasized that it would be "practically impossible" for "a newborn child, who is entirely dependent on its parents, to acclimatize independent of the immediate home environment of the parents." *Holder*, 392 F.3d at 1020-21. This rule precludes any suggestion that the Children somehow acclimatized to life in Mexico as toddlers. *See also Murphy*, 764 F.3d at 1153 (concluding that older child hadn't acclimatized to life in Ireland, despite living there for three years, in part because she "maintained broad and deep family, cultural, and developmental ties to the United States") (internal quotation marks omitted).

III.    Grave Risk[20]

As noted, Article 13(b) of the Convention provides that a wrongfully-removed child need not be returned to his or her country of habitual residence if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."

As an initial matter, the Court disagrees with Mother's argument that "two . . . separate and distinct defenses exist under Article 13(b) of the Convention. One exception is the 'grave risk' exception . . . and the other is the 'intolerable situation' exception . . . ." (Doc. 51 at 23.) The Ninth Circuit has never construed Article 13(b) in this manner—it has repeatedly referred to Article 13(b) as the "grave risk" exception.[21] Indeed, even the

---

[20]    Although Father did not meet his burden of proving that Mexico was the Children's country of habitual residence at the time of their removal in August 2018—which means that Father's ICARA petition must be denied—the Court will proceed to address the question of grave risk so the parties have a complete record in the event of an appeal. *Cf. Sarabia v. Perez*, 225 F. Supp. 3d 1181, 1191 (D. Or. 2016) ("Although I conclude Castro did not meet her burden of proving, by a preponderance of the evidence, that KMRC's country of habitual residence was Mexico, I turn next to Ruiz's affirmative defense. . . . Assuming the Ninth Circuit disagrees with my [habitual residence] conclusion, this analysis is appropriate in the interests of judicial economy . . . .").

[21]    *See, e.g., Cuellar*, 596 F.3d at 509 (referring to Article 13(b) as the "grave risk exception"); *Asvesta*, 580 F.3d at 1020 (discussing "Article 13(b)'s exception for grave risk"); *Gaudin v. Remis*, 415 F.3d 1028, 1036 (9th Cir. 2005) (discussing the "grave-risk exception" and the "grave-risk inquiry").

- 22 -

decision cited by Mother didn't adopt the respondent's "contention that 'intolerable situation' is a separate exception"—it merely stated that the respondent would lose "[e]ven if the Court were to accept" that premise. *Larrategui v. Laborde*, 2014 WL 128048, *6 (E.D. Cal. 2014). Furthermore, the law review article cited by Mother asserts that an "intolerable situation" exists when "placement with the parent who filed the application is manifestly not in the child's best interests,"[22] yet the Ninth Circuit has specifically stated that "[a] court that receives a petition under the Hague Convention may not resolve the questions of who, as between the parents, is best suited to have custody of the child." *Cuellar*, 596 F.3d at 508. Law review articles can't trump binding Circuit law.

On the merits, the Ninth Circuit has emphasized that the grave-risk exception must be "drawn very narrowly" and "is not a license for a court in the abducted-to country to speculate on where the child would be happiest." *Gaudin*, 415 F.3d at 1035, 1036 (citations and internal quotation marks omitted). "Rather, the question is whether the child would suffer 'serious abuse' that is 'a great deal more than minimal." *Id.* at 1035 (citations omitted). Additionally, "because the Hague Convention provides only a provisional, short-term remedy in order to permit long-term custody proceedings to take place in the home jurisdiction, the grave-risk inquiry should be concerned only with the degree of harm that could occur in the immediate future." *Id.* at 1037. Thus, "even a living situation capable of causing grave psychological harm over the full course of a child's development is not necessarily likely to do so in the period necessary to obtain a custody determination." *Id.*

The Court concludes that, although the applicability of the grave-risk exception presents a very close question, Mother has met her burden of clearly and convincingly proving its applicability. In reaching this conclusion, the Court acknowledges there are multiple pieces of evidence that suggest Father is a loving and committed parent who does not resort to violence when angry—he's never struck Mother, Mother allowed him move back into the same house as the Children in Mexico and to care for the Children following

---

[22] Merle H. Weiner, *Intolerable Situations & Counsel for Children: Following Switzerland's Example in Hague Abduction Cases*, 58 Am. U.L. Rev. 335, 343 (2008).

her car accident, Father's new wife trusts him with her children, and Mexican authorities allowed Father to resume custody of K.M.K.F. after conducting a fairly comprehensive inquiry. In addition, some of the videos of Father interacting with K.M.K.F. and the Children depict a loving parent, as did K.M.K.F.'s testimony. Finally, Father's past "psychosis" incidents are not terribly concerning—he's been drug-free since 2016 and his commitment to his sobriety and children appear to be sincere.

Nevertheless, the evidence concerning Father's administration of corporal punishment is deeply troubling and leads the Court to conclude the grave-risk exception has been satisfied. It is difficult to say what was most troubling—the frequency of the punishment, the unusually stylized manner in which it was administered, or the risk of injury it posed. As for frequency, Mother testified that Father would spank the Children (who, it should be recalled, were between 0-3 years old during their time in Mexico) on a daily basis and would spank K.M.K.F. (who was under 10 years old) up to three times per day. Although Father gave slightly lower estimates, he still acknowledged that he was administering physical punishment many times each week. As for the manner of administration, Father initially used sections of PVC pipe and wooden dowels and later began using color-coded plastic rulers (whose colors correspond with different "sins"). The punishment was usually administered behind closed doors, with the child's pants pulled down. During one episode, Father spanked K.M.K.F. more than 20 times. Finally, as for the risk of injury, the Children were spanked so hard that, on at least five occasions, they sustained bruises and visible raised, red marks.

This isn't the first time a court in an ICARA case has been asked to decide whether the administration of corporal punishment triggers the "grave risk" exception. The Court's research suggests that, in most instances, courts have declined to make such a finding.[23]

---

[23] *See, e.g., Sarabia*, 225 F. Supp. 3d at 1191-92 ("While I am reluctant to describe the corporal punishment or domestic abuse in this case as 'minimal,' I conclude Ruiz has failed to demonstrate by clear and convincing evidence that these facts fit the 'grave risk' exception."); *Guerrero v. Oliveros*, 119 F. Supp. 3d 894, 912-13 (N.D. Ill. 2015) (declining to find grave risk, despite mother's admission that "she and her father used to spank J.O. only to discipline her," because there was no evidence of "any physical contact beyond traditional disciplinary measures, and there are no police reports or medical reports documenting any physical abuse"); *Jaet v. Soto*, 2009 WL 35270, *8 (S.D. Fla. 2009) ("The

Nevertheless, not all corporal punishment is created equal. A careful review of the *type* of corporal punishment involved in those cases reveals they involved punishment that was much more sporadic and much less extreme than the punishment at issue here. Thus, it is necessary to go beyond simplistic labels and assess whether the actual conduct to which the Children were exposed in the past—and to which they'll invariably be exposed in the future if returned to Father's custody—should be considered abusive and dangerous.

In making this assessment, it is helpful to examine some of the factors states typically consider when determining whether a parent's use of corporal punishment is reasonable or whether it constitutes child abuse. For example, in Connecticut, in a substantiation-of-abuse hearing, "[t]he hearing officer must assess the reasonableness of the punishment in light of the child's misbehavior and the surrounding circumstances, including the parent's motive, the type of punishment administered, the amount of force used and the child's age, size and ability to understand the punishment." *Lovan C. v. Dep't of Children & Families*, 860 A.2d 1283, 1289 (Conn. App. Ct. 2004). Similarly, in Minnesota, courts consider "the child's age, height, and weight; the seriousness of the child's 'infraction'; the degree of force used by the parent; and the physical impact of the discipline" when "determining whether discipline was unreasonable or excessive." *State v. Myers*, 2012 WL 4856161, *4 (Minn. Ct. App. 2012). And the Supreme Court of Hawai'i has recognized that "factors such as the nature of the misbehavior, the child's age and size, and the nature and propriety of the force used, have been universally considered" in the "context of the criminal parental discipline defense." *Hamilton ex rel. Lethem v.*

only substantiated allegations of physical harm involve disciplinary spanking, a situation not akin to the grave risk of physical harm contemplated by the Hague Convention. The abuse in this case is a concern but does not rise to the serious level of abuse prohibiting the children's return to Mexico."); *Lopez v. Alcala*, 547 F. Supp. 2d 1255, 1261-62 (M.D. Fla. 2008) ("This evidence only indicates that Lopez has used corporal punishment to discipline the children in the past. . . . Ultimately, the alleged abuse in this case is not so severe that it rises to the level of an intolerable situation."). *But see Di Giuseppe v. Di Giuseppe*, 2008 WL 1743079, *7 (E.D. Mich. 2008) (concluding that petitioner's admitted use of "corporal punishment, and only spanking, against her children approximately two or three times a month" was "abusive and excessive" and that such "abuse and neglect constitutes a 'grave risk' of harm" because it "was frequent, extreme and there exists a likelihood, no a certainty, that it would reoccur, before a Canadian court could determine the custody issue").

*Lethem*, 270 P.3d 1024, 1038 (Haw. 2012).

These factors suggest that at least some of the episodes of discipline that were addressed during the evidentiary hearing would constitute child abuse in many (if not all) states. Some of the behavior that elicited spankings was minor disobedience, if it can be characterized as disobedience at all. Indeed, Father admitted that he administered an average of more than one set of spankings *each day* over a period of three years, which suggests he wasn't reserving punishment for major transgressions, and Mother provided testimony (which Father didn't dispute) that Father would punish the Children for bathroom "accidents," which hardly constitutes misbehavior. Additionally, the Children were very young at the time these punishments were being administered—in one of the photos depicting visible bruising, Mother estimated the child was only 20 months old. The Court questions whether a child of this tender age can comprehend why he is being punished. Finally, although Father's use of a ruler is not *per se* unlawful, *see Gonzalez v. Santa Clara Cty. Dep't of Soc. Servs.*, 167 Cal. Rptr. 3d 148, 165 (Cal. App. 2014) ("We cannot say that the use of a wooden spoon to administer a spanking necessarily exceeds the bounds of reasonable parental discipline."), the repeated infliction of bruises and other visible marks suggests Father exceeded the scope of reasonable discipline. *See, e.g., In re S.O.*, 2007 WL 4465519, *6 (Cal. Ct. App. 2007) (removing 12-year old from father's custody because "father subjected [the child] to daily physical discipline, did so in a manner that maximized the pain, left red marks on her, intended to cause fear, and thus caused her physical pain and emotional distress"); *Assiter v. State*, 58 S.W.3d 743, 750 (Tex. Ct. App. 2000) (affirming father's conviction for intentionally or knowingly causing bodily injury to each of his three children where he spanked them with boat oar, causing bruising, although he denied intending to leave bruises).[24]

---

[24]    *See generally Gonzalez*, 167 Cal. Rptr. at 166 (although "the infliction of visible bruises" does not "automatically require[] a finding that the limits of reasonable discipline were exceeded," "visible bruising demarcates, or at least very nearly approaches, the outer limit for the quantum of 'damage' to be tolerated" and tends to support a finding of abuse if the parent "knew his or her conduct would do so, or should have known that bruises were likely to result from the amount of force applied and the method of its application").

To reiterate, the grave-risk issue presents a very close call in this case. The Ninth Circuit's law on this topic suggests that courts must focus on the risk of immediate, serious harm and shouldn't consider the possibility or likelihood of long-term psychological harm. Here, it is unlikely the Children would suffer *grievous* bodily injury if returned to Father's care—although the multiple past instances of bruising are troubling and unacceptable, there is a difference between bruises and more serious injuries. Additionally, although it seems intuitively correct that exposing a child to excessive corporal punishment that is (or borders on) child abuse can't be good for the child's psychological health, there was no expert testimony presented in this case that touched upon how the Children's psychological health would be affected if they were returned to Father's custody for a short period of time necessary to complete Mexican custodial proceedings (which, under *Gaudin*, appears to be the only relevant timeframe). Nevertheless, the bottom line is that returning the Children to Father would create a virtual certainty the Children would be exposed to conduct that likely constitutes child abuse under the law of most states. In the Court's view, and in the absence of any case specifically holding otherwise, that simply has to constitute "a grave risk that . . . would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Cf. Simcox v. Simcox*, 511 F.3d 594, 605 (6th Cir. 2007) (although "there is no clear answer" to the "difficult question [of] precisely what level [of abuse] will expose the child to a 'grave risk' of harm," most "courts that have confronted abusive situations tend to refuse to order the return of the children, at least where the abuse could be characterized as very serious").

Accordingly, **IT IS ORDERED** that:

(1)     Father's petition (Doc. 1) is **denied**; and

(2)     The Clerk of Court shall enter judgment accordingly and terminate this case.

Dated this 21st day of June, 2019.

Dominic W. Lanza
United States District Judge